James S. KRAUSE and Stuart Krause, Respondents,

v.

James A. MERICKEL, Respondent,

Clarence R. Paulson, Respondent,

Otto Leader and James Davis, Respondents,

James E. Ahlfs, Respondent,

Mildred R. Thompson, et al., Defendants,

Arthur E. Noot, Commissioner of Public Welfare, intervenor, Appellant.

No. C5–82–1648.

Supreme Court of Minnesota.

Feb. 17, 1984.

Hubert H. Humphrey, III, Atty. Gen., John L. Kirwin, Sp. Asst. Atty. Gen., St. Paul, for appellant.

Peterson, Engberg & Peterson, Thomas W. Wexler, Minneapolis, for respondents.

KELLEY, Justice.

Following a swimming accident in which 16-year-old respondent James S. Krause sustained injuries rendering him quadriplegic, he and his father, respondent Stuart Krause, jointly commenced an action to recover damages sustained by James as well as for damages sustained by his father. Before trial the case was settled for $100,-000. Respondents proposed to allocate 70% of the settlement proceeds to the father with the remainder to James. Appellant,

the Minnesota Commissioner of Public Welfare, intervened in the pending action asserting that the State of Minnesota had a lien for medical assistance furnished to James, that the proposed allocation failed to award James a pro rata share of the proceeds based on relative damages sustained by the two plaintiffs, and that therefore the state was being deprived of recovery on its medical assistance lien. The trial court held that there need not be pro rata allocation. It did, however, adjust the proposed allocation so the father received approximately 62% and the son approximately 38% of the proceeds. Appellant Commissioner of Public Welfare appeals from that allocation order. By filing a notice of review, respondents raise issues as to the validity of the medical assistance liens filed. We affirm.

On July 21, 1971, when James Krause was a minor 16 years old and a resident of his parents' home, he received injuries in a swimming accident on the Otter Tail River resulting in quadriplegia. His father, Stuart Krause, was responsible for James' medical costs during his minority. When James reached the age of majority, he became eligible for medical assistance. Minn. Stat. ch. 256B (1982). Since March 1974, substantially all of James' medical expenses have been paid by the Department of Public Welfare under that statutory program. As of August 14, 1982, the state had paid $149,769.15 for his medical expenses ($107,608.32 through Wadena County; $42,160.83 through Hennepin County).

Following James' accident, Stuart Krause had consulted with several attorneys to explore chances of tort recovery against third parties. Krause was advised, in substance, that the chances of recovery were slight to non-existent. However, shortly before the expiration of the statute of limitations, present counsel agreed to

prosecute a lawsuit, and Stuart Krause agreed to finance the case if his expenses and losses were paid first out of any settlement or judgment, a proposition to which James, then an adult, acceded. Accordingly, in 1977 Stuart and James jointly filed this action against six individual defendants.[1] Shortly thereafter, a Department of Public Welfare recovery unit wrote the Krauses' attorney informing him that the state had expended large sums for medical assistance rendered to James and indicated that a medical assistance lien pursuant to Minn.Stat. § 256B.042 (1982) would soon be executed and forwarded. The same letter inquired whether the Krauses' attorney would represent the county and Department of Public Welfare's "interests in this matter." In response, the attorney for the Krauses accepted representation of the state and county's interests until such time as an actual conflict of interest arose between the Krauses and the state.

A medical assistance lien in the amount of $50,678.29, plus future payments, was filed by the director of the Wadena County Department of Social Services pursuant to "Minnesota Statutes 1963, Chapter 393.10." Later the Krauses questioned the validity of the 1977 lien. The Department of Public Welfare then filed additional liens with the clerks of the district courts in both Wadena and Hennepin counties in May of 1982.[2]

After discussions with Department of Public Welfare personnel sometime prior to the fall of 1981, the Krauses' attorney concluded that he could no longer represent both the state and counties' interests and the Krauses' interests since settlement negotiations were going on, and the interests of the Krauses and the state appeared to conflict. Thereafter he discussed matters relative to the case and the settlement negotiations with an assistant attorney general assigned to the Department of Public

---

1. In the complaint plaintiffs sought $50,000 for Stuart Krause for medical, hospital and care expense, and $6 million for James Krause for personal injury and consequential damages.

2. These liens were filed pursuant to Minn.Stat. § 256B.042 (1982). Liens were filed in both

counties because the Wadena County medical assistance file was closed in December 1979, when James moved from the state. Later, James moved to Hennepin County, which on August 29, 1980 opened a new medical assistance file in that county.

Welfare. In September 1981, he sought the state's approval of the allocation of a possible settlement. The parties could not agree on allocation. Subsequently, the case was settled early in 1982. The Krauses proposed a proceed allocation which would first compensate the father for his costs and losses. Before settling the case, the Krauses' attorney asked if the state would contribute to the legal costs to try the case, a proposition to which the state never agreed. After the settlement was made, the state was notified. Thereupon, the Commissioner of Public Welfare intervened in the pending action, making a claim to enforce the state's lien interest.[3]

The Krauses' proposed allocation of the total settlement of $100,000 was 70% to the father, Stuart Krause, and 30% to the son, James Krause. Appellant-intervenor claimed the proposed allocation was unreasonable and not proportionally related to the actual damages sustained by each plaintiff. Appellant claimed the proposed allocation would have the effect of defeating the state's lien rights. After hearing, the trial court modified the proposed disposition to the Krauses. It allocated to Stuart Krause $61,933 for out-of-pocket medical expenses he had incurred together with the reasonable value of around-the-clock care he and his wife had given James while he resided in their home. The trial court disallowed Stuart Krause's claim for loss of James' services while James was a minor, adding the amount of that claim to the amount allocated to James, making his share $38,067.[4]

1. We first consider respondents' contention that the Wadena County Welfare Department's 1977 lien filing under Minn. Stat. § 393.10 (1982) is void. That statute provides that the county board or welfare board "may perfect and enforce its lien by following the procedures set forth in sections 514.69, 514.70 and 514.71." Those latter sections govern the procedure for lien filings by hospitals providing medical services. Respondents now claim this 1977 Wadena lien is void on several grounds: the lien was not filed in the county in which each hospital rendering service was located; there was no service of the lien upon those parties claimed to be liable for the costs (the defendants in the tort action); the lien did not list the names and addresses of the hospitals rendering the services; the lien did not list the name of the operator of each hospital rendering service; the lien did not list the admission and discharge dates of each hospitalization; the lien did not list the addresses of the claimed liable parties; the lien was not filed within the required 180 days after each hospital discharge; and, finally, the amount of the lien was overstated.

Appellant responds that the Krauses were not prejudiced even if the lien filing was technically defective. Further, appellant argues that adapting the hospital lien filing sections of Minn.Stat. ch. 514 (1982) to a medical assistance lien logically requires the substitution of "county welfare agency" for the words "the operator of such hospital" that appear in section 514.-69. If that is done, appellant contends the lien was filed in the same county as the welfare agency which disbursed the funds to pay the medical bills. In addition, regardless of whether the lien was served on responsible parties (the alleged tort-feasors), the filing is notice of the lien to those parties. See Minn.Stat. § 514.69 (1982) (last sentence). Moreover, the lien statement listed the name and address of the county welfare agency which had paid the medical bills and contained additional information about the hospitals rendering services to James. The lien statement listed the date of James' injury and the amount of medical payments made by the Wadena County Welfare Department as of the filing date and indicated that those expenses were continuing into the future.

---

**3.** In district court the parties stipulated to the state's requested injunctive relief staying distribution of the settlement proceeds pending the outcome of this action.

**4.** The trial court actually allocated to James $38,167. This was undoubtedly a clerical error because it exceeds $100,000 by $100.

Finally, appellant contends that the statute requires filing of the lien within "180 days from the date when the *last* item of medical * * * care was furnished," Minn.Stat. § 393.10, subd. 2 (1982) (emphasis added), not 180 days after the last item furnished by each hospital.

■ In our view appellant's construction of the hospital lien filing provisions of chapter 514 as applied to a medical assistance lien filing under section 393.10 is reasonable. Lien statutes are remedial in nature, and we have liberally construed them to do "substantial justice between the parties." *See, e.g., Atlas Lumber Co. v. Dupuis,* 125 Minn. 45, 48, 145 N.W. 620, 621–22 (1914).[5] In the case at bar, the 1977 lien filed by Wadena County substantially complied with the filing requirements of sections 514.69–514.71. All of the information required by the statutes was contained in the lien statement.

2. Respondents next contend medical assistance payments made prior to August 1, 1975 are not recoverable under the 1977 Wadena County lien. Prior to August 1, 1975, Wadena County furnished medical assistance to James Krause in the amount of $17,822.44. Wadena County filed the 1977 lien pursuant to Minn.Stat. § 393.10 (1982), which was originally enacted in 1963.[6] In 1973, subdivision 2 was amended by adding the following: "Provided, however, that no lien pursuant to this section shall be effective as to any payment made prior to the time that the lien is filed."[7] This amendment was effective August 1, 1973. Minn.Stat. § 645.02 (1982). In 1975, the legislature again amended the statute, this time by deleting the quoted phrase inserted previously in the 1973 statute.[8]

■ Respondents argue that the 1975 amendment cannot be applied retroactively, and therefore medical assistance rendered to James prior to August 1, 1975 is not validly part of the lien against James' claim. We conclude respondents are correct in this interpretation. A statute is presumed prospective in application unless the legislature "clearly and manifestly" intends retroactivity. Minn.Stat. § 645.21 (1982). Our examination of the 1975 amendment and its legislative history fails to indicate any legislative intent to apply the repeal retroactively. Accordingly, respondents' contention that $17,822.44 of the medical expenses paid prior to August 1, 1975 is not covered by the 1977 lien is correct. Nevertheless, we note that even after excluding that amount the valid lien amounts are in excess of the $100,000 settlement.[9]

3. Having determined that the lien filed by Wadena County was valid—except for $17,822.44—we next address appellant's contention that the trial court abused its discretion in its allocation of the settlement proceeds between Stuart and James Krause. The appellant commissioner argues the settlement proceeds must be allocated in proportion to the actual damages of each plaintiff. Appellant claims, if the proceeds were so allocated, it would promote the state's policy to conserve medical assistance funds for expenditure on those without any source of private funding whatsoever. Further, appellant claims an

---

5. *See also Nelson v. Sampson,* 186 Minn. 271, 243 N.W. 105 (1932); *W.T. Bailey Lumber Co. v. Eveleth Elks Building Corp.,* 167 Minn. 5, 208 N.W. 198 (1926). In these cases the court overlooked technical deficiencies in describing the property or the ownership description in determining the validity of mechanics liens under the predecessor statute to Minn.Stat. § 514.01 (1982).

6. Act of May 3, 1963, ch. 480, 1963 Minn.Laws 716.

7. Act of May 3, 1973, ch. 161, 1973 Minn.Laws 328.

8. Act of June 2, 1975, ch. 247, § 5, 1975 Minn. Laws 699, 700.

9. Respondents also argue the May 1982 Wadena County lien filing, which was pursuant to Minn. Stat. § 256B.042 (1982), was invalid because it was filed more than 1 year after Wadena County had closed its file on James Krause in December 1979. Since we have sustained the 1977 Wadena County lien filing, we need not address that contention.

allocation which awards the father essentially all of his damages, while awarding the quadriplegic son who will require continuing care the remainder of his life a relatively small portion thereof, constitutes a sham to defeat the state's medical assistance lien.

The question concerning the reasonableness of allocation of settlement or judgment awards has arisen in the somewhat analogous situation where an employer or its compensation insurer has asserted subrogation rights under the workers' compensation law to receive future compensation credit for that portion of the employee's third-party tort suit recovery representing damages compensable under the workers' compensation law. *See, e.g., Henning v. Wineman,* 306 N.W.2d 550 (Minn.1981); *Rascop v. Nationwide Carriers,* 281 N.W.2d 170 (Minn.1979); *Naig v. Bloomington Sanitation,* 258 N.W.2d 891 (Minn. 1977). In these workers' compensation cases, we have affirmed settlement allocations if they appear reasonable in the light of the total award to the plaintiffs. We have emphasized the allocation must be "reasonable and not patently arbitrary." *Rascop,* 281 N.W.2d at 173 (citations omitted); *see also Henning,* 306 N.W.2d at 553.

■ Appellant claims the trial court's allocation of 62% to the father and only 38% to the son is unreasonable and patently arbitrary considering the actual damages sustained by each plaintiff in this case. As the trial court noted, even if James had been allocated the entire $100,000, it would be far short of compensating him for his severe injuries. However, in making a determination whether an allocation is reasonable and fair, a court must examine and weigh all the factors existing that bear upon the issue. By necessity, each factual setting will contain different factors to be considered. No hard and fast mathematical ratio can be applicable to all cases without risking gross injustice. Each allocation must turn on its own merits. The court must conduct an ad hoc balancing of the factors and circumstances of the settlement.

In this case it is clear that these plaintiffs, and therefore the state as lienor on James' claim for damages, faced a very difficult hurdle in establishing third-party liability for the injuries James suffered. After the accident Stuart Krause was advised by several attorneys he had consulted that he had no cause of action against any person or corporation. Finally, shortly before the statute of limitations ran out, although cognizant of the difficulty of the case, his present attorneys agreed to file the case provided Stuart Krause agreed to finance it, win or lose, and on condition that, in the event of settlement or judgment in favor of the Krauses, the first dollars of recovery would be allocated to Stuart's losses. James, an adult by this time, agreed to this arrangement.

Following discovery on the liability issues, the defendants indicated an intent to move for summary judgment. Because of the existence of very questionable liability, the Krauses' attorney commenced tentative settlement discussions, which included in July 1981 exploration of compromise possibilities with the Department of Public Welfare concerning its lien interests. When it became clear there existed a conflict between the Krauses' interest and the state's claim, the Krauses' attorney informally notified the state he could no longer represent its interest. He likewise advised the Department of Public Welfare that settlement discussions were in progress. He communicated with an assistant attorney general as to the merits of the pending action and kept the Department of Public Welfare informed by conversations and correspondence concerning the pending negotiations.

By January 1982, three of the named defendants had agreed to contribute a total of $100,000 toward the settlement in exchange for releases. However, the Krauses and the state still were unable to agree on a division of the proceeds. Prior to making the settlement, the attorney for the Krauses asked whether the state would

contribute to the legal costs.[10] Apparently, the state refused to do so; or at any rate it did not agree to share such expenses. In the opinion of the attorney for the Krauses, all of the settlement proceeds could have justifiably been awarded to Stuart Krause. However, the Krauses proposed an allocation that would reimburse the father only for his out-of-pocket losses, the reasonable value of the care he and his wife had provided to James, and loss of James' services while he was a minor. The trial court disallowed the last item.

■ It seems clear to us from an examination of the foregoing facts that Stuart Krause and his attorney acted in good faith in attempting to accommodate the state's interest. Stuart Krause took all the risk of recovery. The state did not attempt to commence an independent action against the alleged tort-feasors, nor did it agree to assume some of the risk by advancing costs for the suit.[11] The amount received in settlement would fall far short of compensating James for his catastrophic injuries. Considering all of these factors, we conclude that the allocation made by the trial court was neither unreasonable nor patently arbitrary. Accordingly, we affirm.

Affirmed.

10. Discovery had generally been limited to liability issues before this time. If the case were to go to trial, it had to be prepared from the damage standpoint and additional costs for obtaining medical testimony, engineering studies, etc. prior to trial were estimated at an additional $10,000 to $15,000.

11. The state concedes its lien recovery in this case must be reduced by a pro rata share of attorney fees and costs because it did not actually contribute to the litigation resulting in recovery. *See Robertson v. Johnson,* 294 Minn. 201, 200 N.W.2d 316 (1972). However, it is clear that it did not agree to share in costs of continuing the litigation prior to the time of the settlement.